UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ERICA DAVIS, as Personal Representative of the Estate of ANDREW DALE DAVIS, deceased, and minor children, JC, minor child, SD, minor child;<br><br>MICHAEL M. MASCHMEYER, as Personal Representative of the Estate of R. WAYNE ESTOPINAL, deceased; and<br><br>JAMES JOHNSON and BRADLEY HERMAN, individually and as Independent Co-Administrators of the Estate of SANDRA JOHNSON, deceased,<br><br>    Plaintiffs,<br><br>    v.<br><br>CRANFIELD AEROSPACE SOLUTIONS LIMITED,<br><br>    Defendant. | Case No. 2:20-cv-00536-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court is Defendant Cranfield Aeropsace Solution Limited's

Motion to Dismiss Plaintiffs' Complaint for lack of personal jurisdiction. (Dkt.

13). Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, this matter shall be decided on the record before this Court without oral argument. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B). For the reasons explained below, the Court finds it does not have personal jurisdiction over Cranfield to entertain Plaintiffs' claims.

## BACKGROUND

### 1. Procedural Background

This case concerns a fatal crash of a Cessna Model 525 corporate jet airplane that occurred on November 30, 2018, causing the deaths of its pilot and two passengers, R. Wayne Estopinal, Sandra Johnson, and Andrew Davis. The aircraft, piloted by Mr. Davis, took off from a small airport in Clark County, Indiana, bound for Chicago, Illinois. A few minutes after takeoff, the aircraft crashed in Clark County, Indiana. Everyone on board was killed.

Plaintiffs bring this action on behalf of the three decedents, along with Andrew Davis's two minor children. Plaintiffs allege that the crash was caused by the Tamarack Active Winglet aircraft load alleviation system, trademarked as "ATLAS," which was manufactured and installed on the aircraft on May 28, 2018, by Tamarack Aerospace Group, Inc. Tamarack installed the ATLAS system on the

aircraft pursuant to a Supplemental Type Certificate ("STC"), issued by the Federal Aviation Administration. These certificates allow an applicant to modify an aeronautical product from its original design. Defendant Cranfield Aerospace Solutions Limited applied for and held the STC on behalf of Tamarack until it transferred the STC to Tamarack in 2019 – after the fatal crash.

Plaintiffs, as personal representatives for the decedents, initially filed suit in the Eastern District of Washington, naming both Tamarack and Cranfield as defendants and alleging both were liable as "manufacturers" under the Washington Product Liability Act ("WLPA") and that Tamarack was also liable as a "seller." After Cranfield moved to dismiss the complaint for failure to state a claim and lack of jurisdiction, Plaintiffs conceded that personal jurisdiction over Cranfield was lacking in Washington.

About two months later, they filed this lawsuit against Cranfield in this Court, alleging claims under Idaho's Product Liability Reform act, common-law negligence, and a willful-and-reckless misconduct theory. Plaintiffs, who are residents of Indiana and Louisiana, do not identify any tortious conduct by Cranfield that occurred in Idaho but instead allege that Cranfield's contractual relationship with Tamarack justifies exercising personal jurisdiction over Cranfield in Idaho. Tamarack is not a party to this lawsuit.

On April 28, 2021, Cranfield filed a motion to dismiss for lack of personal jurisdiction to Rule 12(b)(2) of the Federal Rules of Civil Procedure (Dkt. 13). On May 17, 20, the Court approved the parties' stipulation to conduct jurisdictional discovery. After conducting discovery, Plaintiffs filed their opposition to the motion to dismiss, arguing that this Court may exercise specific jurisdiction over Cranfield.

## 2.  Factual Background

### A.  *Defendant Cranfield and its Contractual Relationship with Tamarack*

Cranfield is an English company that performs its work in England. *Howarth Decl.*, ¶ 3, Dkt. 13-2. All its employees, including its executive leadership, are based in England. *Id.* ¶ 5. Cranfield has never had offices or facilities in Idaho, nor have any of its employees been based in Idaho while working for Cranfield. *Id.* ¶ 6. Cranfield has never advertised or otherwise cultivated a market for its services in Idaho. *Id.* ¶ 11.

 In 2013, Tamarack approached Cranfield, seeking assistance in obtaining an STC from the European Union Aviation Safety Agency ("EASA"), which would authorize the installation of the ATLAS system on certain variants of the Cessna Model 525 jet. *Id.* ¶ 8. Tamarack's initial contact with Cranfield led the parties to enter a contract titled, "Testing and Certification Agreement." *Id.* ¶ 12, Ex. A. The parties negotiated the contract primarily through phone and email communications

– although one negotiation meeting occurred in person at Cranfield's offices in England. *Id.* ¶ 12(a). During the negotiations, Cranfield informed Tamarack that all Cranfield staff working pursuant to the contract would be based in the United Kingdom. *Id.* Tamarack and Cranfield also agreed that New York law would govern their agreement, and the parties "IRREVOCABLY" submitted to the venue and jurisdiction of the federal courts located in New York and waived any objection to venue and jurisdiction in New York. *Howarth Decl.*, Ex A at Sec. 13.6, Dkt. 13-3. The parties' agreement makes no mention of Idaho other than to say that Tamarack is a Washington corporation with its principal place of business in Sandpoint, Idaho. *Id.*, p. 1.

The parties' contract required Cranfield to assist in preparing the documentation for the EASA application, submitting the application to EASA, acting as a direct liaison with EASA, and serving as the official holder of the STC once it was issued. *Id.* ¶¶ 15-16, 18-20. Pursuant to the parties' contract, Cranfield served as the main point of contact with EASA during the process of obtaining the STC and also provided consulting services to Tamarack to help develop a "Certification Plan" for the ATLAS system to submit to EASA, as well as the application for the STC from EASA. *Id.* ¶¶ 13, 15.

After EASA issued the STC, Cranfield then played the same role in securing and maintaining an STC from the FAA. *Id.* ¶¶ 24-30. In 2019, Cranfield transferred

both STCs to Tamarack. *Id.* ¶¶ 21, 31. The transfer was done pursuant to Section

4.3 of their Agreement, as the parties had contemplated and anticipated that the

STCs would ultimately be transferred to Tamarack. *Id.* ¶¶ 12.c, 21, 31.

Cranfield maintains it performed no work related to the ATLAS system

beyond the services outlined in its agreement with Tamarack: it helped develop the

Certification Plans and applications sent to EASA and the FAA, *id.* ¶¶ 15-16, 26-

27, but never suggested or made any design changes to the winglets system, *id.* ¶¶

19, 20.b, 29, 30.b, never physically produced, repaired, or refurbished any

winglets, *id.* ¶ 32, nor sold, distributed, or delivered any winglets, *id.* ¶ 33.

Cranfield further maintains that it did not disseminate to any customers in the

United States any materials related to the winglets system, such as bulletins or

manuals. *Id.* ¶ 30.c.

Moreover, according to Cranfield, its employees did not perform any

substantive work in Idaho related to the winglets system. *Id.* ¶¶ 14.c, 17.b.

Cranfield employees worked on the EASA and FAA Certification Plans and

applications in England, communicating with Tamarack employees in Idaho. *Id.*

¶¶ 1C5.a, 20.a, 26.b, 30.a. Cranfield employees did not make any contact with

Idaho when interfacing with European and U.S. regulators. The STC applications

were sent to the EASA office in Germany and the FAA office in New York. d. ¶

15.b. And none of the FAA officials they interacted with were based in Idaho. *Id.* ¶ 26.c.

As explained in more detail below, Cranfield employees took just two trips to Idaho during the duration of Cranfield's work with Tamarack. *Id*. ¶¶ 14.b, 17.c. Both visits were proposed by Tamarack, and neither resulted in substantive work being performed by Cranfield employees in Idaho. *Id.* ¶¶ 14, 17. By contrast, Tamarack employees travelled to England approximately twelve times to meet with Cranfield employees and to prepare the applications to EASA and the FAA.

### B. Cranfield's Trips to Idaho

Cranfield employees travelled to Idaho twice between executing the agreement with Tamarack and the fatal plane crash at issue in the case: once in 2013 and a second time in 2017.

#### 1) 2013 Trip

Following the execution of the contract between Tamarack and Cranfield in June 2013, Cranfield sent its employees, Peter Howarth, a senior engineer and Cranfield's head of design, and Graham Campion, a member of Cranfield's business-development team who negotiated the contract, to Tamarack's facility in Sandpoint, Idaho. *Howarth Dep.* 8:20; 36:18-40:2. Cranfield's employees traveled to Idaho to get to know the people at Tamarack, to "launch the [contract]

activities," and to transition Tamarack from Cranfield's business-development team to its engineering team. *Howarth Dep.* 39:20-43:21.

During the three days of meetings in Idaho between Cranfield employees and Tamarack, Mr. Howarth met Tamarack's engineers working on the development of the ATLAS system's design and observed a working protype of the ATLAS system installed on an aircraft at the Tamarack facility. *Howarth Dep.* 43:13-47:25. These in-person meetings between Cranfield and Tamarack allowed Mr. Howarth to speak directly to the Tamarack engineers and familiarize himself with the ATLAS system, so Cranfield could develop an overall approach for certification planning. In addition, Mr. Howarth reviewed with the Tamarack engineering team the regulations necessary to obtain the EASA certification for the ATLAS system and to determine what testing and data gathering Cranfield would need from Tamarack for inclusion in the EASA certification application. *Howarth Dep.* 54:15-24; 58:10-60:14.

### 2) *2017 Trip*

In April 2017, Cranfield sent its Chief Stress Engineer, Alan Missenden, to Tamarack's facility in Idaho. *Howarth Dep.* 71:14-72:5; 77:6-24. Mr. Missenden traveled to Idaho to oversee testing EASA and the FAA required as part of certification process to show the integrity and safety of the aircraft or aircraft design for which certification was sought. *Howarth Dep.* 82:14-83:1. In this

capacity, Mr. Missenden observed testing of the ATLAS to determine whether the

test protocols and test results satisfied the relevant certifying agency's regulation.

*Howarth Dep.* 3:2-84:22. Mr. Missenden oversaw this testing over the course of a

"Sunday to Saturday," with a day on either end spent traveling to and from the

United Kingdom. *Howarth Dep*. 85:1-5. Cranfield maintains that Mr. Missenden

did not provide any substantive input on the design or construction of the winglet

system, and no changes were made to its design or construction as a result of the

trip. *Howarth Decl.* ¶ 17b.

     Cranfield employees took no other trips to Idaho. As noted, Plaintiffs allege

these two trips to Idaho, along with Cranfield's contractual relationship with

Tamarack, justifies a finding of personal jurisdiction over Cranfield in Idaho.

## LEGAL STANDARD

     In the context of Cranfield's motion to dismiss under Fed.R.Civ.P. 12(b)(2),

Plaintiffs bear the burden of proving that jurisdiction is appropriate. *See Boschetto*

*v. Hansing*, 539 F.3d 1011. 1015 (9th Cir. 2008); *see also Schwarzenegger v. Fred*

*Martin Motor Co*., 374 F.3d 797, 800 (9th Cir.1990). Where, as here, the motion is

based on written materials rather than an evidentiary hearing, Plaintiffs need only

establish a prima facie showing of jurisdictional facts to withstand the motion to

dismiss. *See Ballard v. Savage*, 65 F.3d 1495 (9th Cir. 1995).

The Court must take Plaintiffs' uncontroverted allegations in the complaint as true and resolve factual disputes in affidavits in its favor. *See Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1108 (9th Cir. 2002).  But if Cranfield offers evidence in support of its motion, Plaintiff may not simply rest on the bare allegations of their complaint. *See Amba Mktg. Sys., Inc. v. Jobar Int'l*, Inc., 551 F.2d 784, 787 (9th Cir. 1977). Instead, Plaintiffs must come forward with facts, by affidavit or otherwise, in response to Cranfield's version of the facts. *See Id.*

Where there is no applicable federal statute governing personal jurisdiction, as in this case, the law of the state in which the district court sits applies. *See Schwarzenegger*, 374 F.3d at 800. Because Idaho's long-arm statute, codified in Idaho Code § 5–514, allows a broader application of personal jurisdiction than the Due Process Clause, the Court need look only to the Due Process Clause to determine personal jurisdiction. Thus, under Idaho law, the jurisdictional analysis and federal due process analysis are one and the same.

## ANALYSIS

The Fourteenth Amendment's Due Process Clause limits a state court's power to exercise jurisdiction over a defendant. *Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cty.*, 137 S.Ct. 1773, 1779 (2021). "Because a state court's assertion of jurisdiction exposes defendants to the State's coercive power, it is subject to review for compatibility with the Fourteenth

Amendment's Due Process Clause, which limits the power of a state court to render a valid personal judgment against a nonresident defendant." *Id.* (internal quotation marks and citations omitted). A nonresident defendant must have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). The primary focus of the personal jurisdiction inquiry is the defendant's relationship to the forum state. *Bristol-Meyers*, 137 S.Ct. at 1779.

This focus has led courts to recognize two types of personal jurisdiction: general and specific. A court may exercise general jurisdiction only when a defendant is "essentially at home" in the State. *Goodyear Dunlop Tires Operations, S. A v. Brown*, 564 U.S 915, 919 (2011). "A court with general jurisdiction may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different State." *Bristol-Myers*, 137 S. Ct. at 1780. "But only a limited set of affiliations with a forum will render a defendant amenable to general jurisdiction in that State." *Id.* (internal quotation marks omitted).

"Specific jurisdiction is different: It covers defendants less intimately connected with a State, but only as to a narrower class of claims." *Ford Motor*, 141 S. Ct. at 1024. "The inquiry whether a forum State may assert specific jurisdiction

over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). Specifically, "the defendant's suit-related conduct must create a substantial connection with the forum State." *Id.* "For this reason, specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Bristol-Myers Squibb Co. v. Superior Court*, 137 S.Ct. 1773, 1780 (2017) (internal quotation marks omitted). "When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Id.*

Plaintiffs here concede the Court cannot exercise general jurisdiction over Cranfield. Instead, they argue that Cranfield's contacts with Idaho give rise to specific jurisdiction.  The Ninth Circuit analyzes specific jurisdiction under a three-prong test. This test examines whether (1) the defendant has either purposefully (a) directed its activities towards the forum or initiated a transaction with the forum or one of its residents or (b) availed itself of the privileges and benefits of the forum permitting it to benefit from the protections of the forum's laws; (2) the cause of action arises out of or relates to the defendant's forum-related activities; and (3) the assertion of jurisdiction is reasonable and comports with "fair play and substantial justice." *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1107 (9th Cir. 2020).

Plaintiffs bears the burden of satisfying the first two prongs of the test. *Wells Cargo, Inc. v. Transp. Ins. Co.*, 676 F. Supp. 2d 1114, 1119–20 (D. Idaho 2009) (citing *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205 (9th Cir. 2006) (en banc)). If Plaintiffs succeed in meeting the first two prongs, the burden then shifts to Cranfield "to present a compelling case that the exercise of jurisdiction would not be reasonable." *Id.*   (internal quotation marks and citation omitted).

## 1. Purposeful Availment

Either purposeful availment of the forum or the purposeful direction of activities toward the forum can satisfy the first prong. *See, e.g., Albertson's LLC v. Kleen-Sweep Janitorial Co*., No. CIV. 09-263-S-BLW, 2009 WL 3786290, at *3 (D. Idaho Nov. 9, 2009) (citing *Yahoo! Inc. v. La Ligue Contre Le Racisme*, 433 F.3d 1199, 1206 (9th Cir. 2006). "Purposeful direction generally applies to tort cases, in which a court applies an effects test focusing on the forum where the defendant's actions were felt, whether or not the actions themselves occurred within that forum." *Id.* When a case involves tort claims, a single act creating a substantial connection with the state can support personal jurisdiction. *Roth v. Garcia Marquez*, 942 F.2d 617, 621 (9th Cir. 1991). In contrast, purposeful availment applies to contract claims, and requires the Court to examine whether the defendant "purposefully avails itself of the privilege of conducting activities' or

consummates a transaction' in the forum, focusing on activities such as delivering goods or executing a contract." *Id.* (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (internal quotation marks and brackets omitted).

This case sounds in tort; thus, the Court would typically employ a "purposeful direction" analysis. *See, e.g., Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069 (9th Cir. 2017) ("Where, as here, a case sounds in tort, courts typically employ the "purposeful direction test.").  But Plaintiffs cannot show they suffered any harm in Idaho – a critical element of the purposeful direction or "effects test." *See, e.g., Dole Food Co. v. Watts*, 303 F.3d 1104, 1112-13 (9th Cir. 2002) (noting a "harm in the forum" is "necessary" to satisfy the purposeful direction test). They therefore argue that the Court should instead apply the "purposeful availment" standard typically employed in cases sounding in contract. In support of this assertion, Plaintiffs rely heavily on the court's reasoning in *Costa v. Keppel Singmarine Dockyard PTE, Ltd.*, No. CV 01-11015MMM, 2003 WL 24242419, at *15 (C.D. Cal. Apr. 24, 2003).

In *Costa*, the plaintiff's decedent, a crew member working on a ship as it sailed in the Western Pacific Ocean, sustained fatal injuries resulting from an ammonia discharge valve explosively separating. *Id.* The plaintiff alleged that a Wisconsin corporation improperly designed the valve, and the Singaporean

defendant (KSD) improperly installed the valve at its shipyard in Singapore pursuant to a contract with the California-based shipowner. Although plaintiff alleged strict liability and negligence claims and was not a party to the contract, the court applied a purposeful availment analysis; it reasoned that the claims against KSD arose "out of its performance of contractual obligations, as the company undertook to repair the [ship] only as a consequence of its entry into a contract with [the shipowner]." *Id.* at *15.

Based on *Costa*, Plaintiffs argue that the Court should apply the purposeful availment analysis in this case because their negligence and product liability claims against Cranfield arise from Cranfield's performance of its contractual obligations with Tamarack. But even applying the purposeful availment analysis, Plaintiffs cannot show Cranfield had sufficient minimum contacts with Idaho to subject it to specific personal jurisdiction here.

The purposeful availment analysis examines whether the defendant purposefully availed itself of the privilege of doing business in a forum state by engaging in some type of affirmative conduct that allows or promotes the transaction of business within the forum state. *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir.1990). In this way, a defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d

797, 802 (9th Cir. 2004) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

"In return for these benefits and protections, a defendant must—as a quid pro

quo—submit to the burdens of litigation in that forum." *Id.* (quoting *Burger King*

*Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (internal quotation marks omitted).

This analysis is designed to ensure that the defendant will not be haled into a

jurisdiction solely based on random, fortuitous, or attenuated contacts. *Id.* at 475.

"A showing that a defendant purposefully availed himself of the privilege of

doing business in a forum state typically consists of evidence of the defendant's

actions in the forum, such as executing or performing a contract there."

*Schwarzenegger*, 374 F.3d at 802. But Cranfield's contracting with Tamarack, an

Idaho-based corporation, does not by itself establish minimum contacts with Idaho.

*Burger King*, 471 U.S. at 478. Rather, the Court must assess "prior negotiations

and contemplated future consequences, along with the terms of the contract and the

parties' actual course of dealing" to determine whether it is appropriate to exercise

specific jurisdiction over Cranfield. *Id.* at 479.

Considering these factors, none of the facts here show that Cranfield, itself,

engaged in any affirmative conduct that allowed or promoted the transaction of

business in Idaho. First, it is undisputed that Cranfield did not initiate the contract

discussions with Tamarack or otherwise directly solicit business in Idaho, and none

of Cranfield's contract negotiations occurred in Idaho. As noted by this Court, "if

the defendant directly solicits business in the forum state, the resulting transactions will probably constitute the deliberate transaction of business invoking the benefits of the forum state's laws." *Clearwater Rei, LLC v. Focus Consulting Advisors*, LLC, No. CIV. 1:10-448 WBS, 2011 WL 3022071, at *4 (D. Idaho July 22, 2011) (quoting *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 840 (9th Cir. 1986)). "Similarly, conducting contract negotiations in the forum state will probably qualify as an invocation of the forum law's benefits and protections." *Id.* By contrast, "when a plaintiff solicits a defendant to enter into a contract, the defendant is not normally considered to have availed itself of the laws of the [forum's] state." *Id.* (citing *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990).

Here, there is no evidence that Cranfield sought out any Tamarack services in Idaho or benefitted from the fact that Tamarack happens to reside in Idaho. Indeed, the Tamarack and Cranfield expressly agreed New York – not Idaho law – would govern the parties' agreement, which indicates "rather forcefully" that Cranfield "did not purposefully direct its activities toward" Idaho. *Id.* at *6 (citing, e.g., *Jones v. Petty–Ray Geophysical Geosource, Inc.*, 954 F.2d 1061, 1069 (5th Cir.1992) (noting that choice of law provision designating non-forum state's laws "indicate[d] rather forcefully" that the defendant "did not purposely direct its activities toward" the forum). And during the contract negotiations, Tamarack

representatives traveled to England, but Cranfield's representatives never traveled to Idaho.

Moreover, the parties understood Cranfield would perform most of its work, and where Cranfield did indeed perform most, if not all, its substantive work pursuant to the contract. Cranfield has never played a role in manufacturing, assembling, or refurbishing Tamarack's ATLAS winglets system, and Cranfield has never sold, distributed, or delivered the Tamarack winglet system in the United States. Tamarack wired all of its payments to Cranfield in England, and Cranfield made no payments to Tamarack in Idaho. These facts indicate Cranfield's contacts with Idaho were merely "random, fortuitous, or attenuated" and thus cannot establish jurisdiction over Cranfield in Idaho. *Burger King*, 471 U.S. at 475.

Nor did Cranfield employees' two short trips to Idaho create the requisite contacts with Idaho to support a finding of jurisdiction. "While physical entry into the State ... is certainly a relevant contact, a defendant's transitory presence will support jurisdiction only if it was meaningful enough to create a 'substantial connection' with the forum State." *Picot v. Weston*, 780 F.3d 1206, 1213 (9th Cir. 2015) (internal citations and quotation marks omitted).

Here, this substantial connection is lacking. In both instances, Cranfield traveled to Idaho at Tamarack's request and expense. The first visit – which lasted a mere three days – amounted to essentially a "meet and greet" between the parties,

and little, if any, substantive work was performed. During the second visit,

Cranfield oversaw some testing performed by Tamarack over the course of a week,

with a day on either end spent traveling to and from the United Kingdom, and,

again, Cranfield performed little substantive work while in Idaho. By contrast, over

the course of the parties' contract, Tamarack employees traveled to England

approximately twelve times to meet with Cranfield employees and to prepare the

applications to EASA and the FAA.

     In short, the two trips by Cranfield employees to Idaho over the course of

five years "hold no special place in [Cranfield's] performance under the agreement

as a whole." *Picot*, 780 F.3d at 1213.  As contemplated by the parties, the

overwhelming bulk of Cranfield's work for Tamarack occurred in England.

Cranfield employees worked on the EASA and FAA Certification Plans and

applications in England, communicating with Tamarack employees in Idaho.

Cranfield sent the STC applications the EASA office in Germany and the FAA

office in New York. And none of the FAA officials they interacted with were

based in Idaho.

     Despite Cranfield's lack of ties to Idaho, Plaintiffs contend that "courts have

found that the 'purposeful availment' standard was satisfied in cases involving far

lesser contacts with the forum state." *Pls' Resp. Br.*, p. 14, Dkt. 32.  Once again

relying on *Costa*, Plaintiffs note the court there found purposeful availment

"despite the fact that the contract contemplated that KSD's work would be performed outside the forum state, and despite the fact that KSD negotiated the contract from Singapore and provided for the application of Singapore law." *Id.* (quoting *Costa*, 2003 WL 24242419, at *17).

But the court in *Costa* exercised jurisdiction based *solely* on the fact the Singaporean defendant solicited the contract that gave rise to the plaintiff's claims in California. *Costa*, 2003 WL 24242419, at *20. Had the defendant in *Costa* "not purposefully injected itself into California to solicit the repair contract on the [ship]," the Court would have found jurisdiction lacking. *Costa*, 2003 WL 24242419, at *20. Because Plaintiffs present no evidence that Cranfield purposefully injected itself into Idaho to solicit the contract with Tamarack, Plaintiffs cannot rely on *Costa* to support a finding of jurisdiction in this case. Indeed, if anything, *Costa* supports a finding of *no* jurisdiction in this case.

Plaintiffs' reliance on *McHugh v. Vertical Partners West*, LLC, 2021 WL 1554065 (D. Idaho Apr. 19, 2021) is also misplaced. Plaintiffs argue *McHugh* supports jurisdiction here on the grounds that both cases involve an indemnification agreement. But this case differs from *McHugh* in significant ways.

In *McHugh*, this Court found the following facts supported a finding that the defendant, a Chinese manufacturer, purposefully availed itself of the privilege of doing business in Idaho: the defendant had "routinely conducted business in Idaho"

by selling its products to the third-party plaintiff and shipping them to the plaintiff's Idaho headquarters; the defendant entered into an "exclusive" supply agreement with the plaintiff, which stated the plaintiff was based out of Idaho and made the plaintiff the exclusive purchaser of the defendant's products; the agreement was "of great pecuniary significant" for the defendant. *Id.* at *4. In addition, the parties' exclusive supply agreement referenced Idaho several times, specifically making Idaho the governing law of the contract in the choice-of-law and arbitration provisions. *Id.* And, importantly, the third-party plaintiff had sued the Chinese defendant under the indemnity provision in the parties' agreement, alleging harm suffered in Idaho. *Id.*

This case, by contrast, is a tort case involving all out-of-state plaintiffs, an out-of-state accident, and an out-of-state defendant. No party alleges any harm suffered in Idaho, and Cranfield, unlike the defendant in *McHugh*, did not "routinely conduct business in Idaho" by regularly shipping products to, or providing services, in Idaho. Cranfield's only tie to Idaho is through the non-party, Tamarack. This singular tie, without more, does not establish the minimum contacts necessary for to subject Cranfield to personal jurisdiction in Idaho.

## 2.  Conclusion

Given that plaintiff cannot establish the first prong of the test for specific personal jurisdiction, the court need not proceed to the remaining inquiries under

the Ninth Circuit's test. *See Boschetto*, 539 F.3d at1016 ("[I]f the plaintiff fails at the first step, the jurisdictional inquiry ends and the case must be dismissed."). Plaintiffs have thus failed to demonstrate that the Court has specific personal jurisdiction over defendant.

## ORDER

**IT IS ORDERED that** Defendant Cranfield Aerospace Solutions Limited's Motion to Dismiss the Complaint (Dkt. 13) is **GRANTED**.

DATED: January 4, 2022

B. Lynn Winmill
U.S. District Court Judge